IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs at Knoxville August 23, 2022

## STATE OF TENNESSEE v. BENJAMIN HARTSHAW

**Appeal from the Circuit Court for Rutherford County**
**No. F-79617      David Bragg, Judge (Trial & Sentencing)**
**James Turner, Judge (Motion for New Trial)**

_____

## No. M2021-01231-CCA-R3-CD

_____

The Defendant, Benjamin Hartshaw, was convicted by a Rutherford County Circuit Court jury of six counts of rape of a child, a Class A felony, and four counts of aggravated sexual battery, a Class B felony, for which he is serving an effective forty-six-year sentence. *See* T.C.A. §§ 39-13-504(a)(4) (2018) (aggravated sexual battery of a victim less than thirteen years of age), 39-13-522(a) (2018) (rape of a child). On appeal, the Defendant contends that (1) the trial court erred in denying his motion for a mistrial after one of the prosecutors referred in closing argument to the Defendant's having been "arrested and . . . put in jail," (2) the court erred in giving a curative instruction, contrary to the defense request for no instruction, and (3) he is entitled to relief due to cumulative trial error. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

David L. Clarke, Murfreesboro, Tennessee, for the Appellant, Benjamin Hartshaw.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Jennings Hutson Jones, District Attorney General; and Sharon Reddick and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to his sexual abuse of a then-twelve-year-old female family member. The offenses occurred over the course of two days, March 20 and 21, 2018, in which the Defendant and the victim were both guests in the home of another family member. The Defendant denied the allegations and alleged that the victim

fabricated them because she was angry with him for threatening her with corporal punishment when she disobeyed his instructions.

At the trial, the victim testified that she was at her aunt, A.W.'s house on the morning of March 20, 2018. The victim said that her younger sister, R.,[1] and her then-eight-year-old aunt, M.M., were also present, and that adult family members came and went during the day. The victim said that before dinner, her grandmother and A.W. left the home to go to Walmart for groceries, leaving the Defendant alone with the three minor children. The victim said she was in a back bedroom playing with R. and M.M. and that the Defendant called her into a front bedroom that was used as a living room. She said the Defendant stated she was his favorite niece and asked if he were her favorite. She said the Defendant referred to an earlier conversation the victim had with her grandmother, her mother, and her aunt regarding the victim's behavior, which included sexual activity with a juvenile boy. The victim said that the Defendant stated that he wanted to see if the victim knew what she was doing and that he told her to suck his penis. She said that when she refused, the Defendant stated that it was okay because they were not related by blood. She said the Defendant forced her to perform fellatio by pushing her head down. She said he threatened her that he would hurt her if she told anyone. She said he also pulled up her shirt, pulled down her bra, sucked her nipples, and touched her breasts. She said he instructed her to lie on a couch face down, pulled down her pants, and had penile/vaginal intercourse with her. She said he stopped and inserted his fingers in her vagina. The victim said she called her grandmother to inquire when the grandmother and the aunt would be home. She said the Defendant stated he wished the other adults would leave more often so he could have sex with her more frequently. The victim said the Defendant had sex with her again, although she did not provide details of this encounter. The victim said the Defendant stopped when the victim's grandmother called to tell the children to come outside to carry in groceries. The victim said her mother picked up R. and the victim that night.

The victim testified that on the next day, March 21, 2018, her mother took her to her aunt's house after a dentist appointment. The victim said she had wanted to go to work with her mother, rather than returning to her aunt's house, because she had not wanted to be alone with the Defendant. The victim said that her grandmother, the Defendant, and M.M. were also present when she arrived. The victim said that during the day, the Defendant called her to the back door and offered for her to smoke cigarettes with him. She said she declined. She said she and the Defendant eventually went into the living room, where she played with toys until the Defendant asked her to suck his penis and stated it would be a present for his birthday, which was the next day. She said that despite her refusal, the Defendant forced her to perform fellatio. She said he sucked her nipples and

_____

[1] Only R.'s first name appears in the record. Thus, we have identified her by a single initial.

groped her breasts. She said that he told her to lie on the couch and that he had penile/vaginal intercourse with her. She said that the Defendant stopped and that she thought he heard footsteps. She said that she and the Defendant sat up on the couch and that M.M. came into the room to get something and left. She said the Defendant inserted his fingers in her vagina. She said the assaults continued "on and off" until her aunt and uncle returned home.

The victim testified that on the evening of March 21, 2018, the adults present in her aunt's home were going to play cards. She said that the Defendant was in the front room setting up the card table and that he called M.M. into the room. She said she stated under her breath, "[W]hy, so you can do the same thing you did to me?" She said the Defendant had not understood her but thought she had an "attitude." She said her grandmother told her to leave the room because the adults were going to play cards. She did not recall the Defendant's threatening to "whoop" her if she did not leave the room.

The victim testified that she went into the back room with M.M. and R. She said she told M.M. to get her mother, A.W. The victim said that her grandmother came into the room and that she revealed the abuse to her grandmother and later to A.W. The victim said she told her mother about the abuse later that evening.

The victim acknowledged that she had run away from home with a sixteen-year-old boy, with whom she had sex. This occurred in early March 2018. She acknowledged that before the March 20 and 21, 2018 incidents, she had been diagnosed with depression and oppositional defiant disorder, had engaged in self-harm, and was taking medication. She had lived a semester with her grandmother in Lexington, Tennessee, while her mother and sister lived in Murfreesboro. She agreed her grandmother caught her smoking cigarettes but said she had not smoked while she visited Murfreesboro in March 2018.

A.W. testified that her mother, M.M., and the Defendant, all of whom lived together in Lexington, visited her home in Murfreesboro in March 2018. A.W. said that in her kitchen, a person could only see what happened in the kitchen or laundry room. She said that what occurred in the living room could not be seen from the kitchen, back bedroom, or back door.

A.W. testified that shortly after the visitors from Lexington arrived, the adult women had a conversation with the victim about "typical young teenage girl talk" involving the adults giving the victim advice. A.W. said the victim's mother had been concerned about things the victim had done three to four weeks earlier. A.W. said that the Defendant had been in the house during the conversation but that she did not recall his location.

A.W. testified about going to Walmart with her mother, who was the victim's grandmother, on March 20, 2018. She recalled that while they were gone, they had received a call inquiring when they would return because the children were hungry.

A.W. testified that on the evening of March 21, 2018, the adults planned to play cards and to celebrate the Defendant's birthday. She said the Defendant told the children to leave the living room in order for the adults to play cards. A.W. said that as the adults were preparing to play, her mother came to the door and told her the victim wanted to tell her something.

A.W. testified that she went into the back bedroom, where the victim was crying and emotional. A.W. said the victim stated that the Defendant had touched her, tried to force her to perform oral sex on him, and "fingered her." She said the Defendant came to the door and asked what was happening. A.W. stated that her mother told the Defendant that she knew he had touched the victim and that the Defendant "started going ballistic." A.W. said the Defendant "talked over" the victim when the victim tried to explain what the Defendant had done to her. She said that the victim was angry and that the victim stated she would fight the Defendant if she were male. A.W. said the Defendant stated that the victim was lying and that he called the victim "fast" and "the 'B' word."

A.M. testified that she was the victim's grandmother and the Defendant's sister. A.M. was also A.W. and M.M.'s mother. A.M. said that in March 2018, she went with the Defendant and M.M. to visit relatives in Murfreesboro. She said that on the first or second day they were there, the adult female relatives had a conversation with the victim about problems the victim's mother had been having with the victim. A.M. was unsure whether the Defendant had come into the room during the conversation.

A.M. testified that on March 20, 2018, the victim had been at A.W.'s house during the day while the victim's mother was at work and that A.M. had picked up R. after school and brought her to A.W.'s house. A.M. said that she and A.W. left at some point to go to Walmart, leaving the victim, M.M., and R. home with the Defendant. A.M. said that as they were returning home, the victim called and asked A.M. to bring her something to drink. A.M. said that because they were arriving at home, she told the victim for the children to come outside to help carry in groceries.

A.M. testified that on March 21, 2018, the victim's mother arrived at A.W.'s house with the victim. A.M. said that the victim had stated she did not want to stay but that the victim's mother told the victim that she could not go home and must stay. A.M. said that during the day, she, the victim, M.M., and the Defendant were home. A.M. said she cooked and cleaned during the day, while the victim, M.M., and later R. played in the back room. A.M. said she picked up R. after school. A.M. said that the Defendant had been in the living room, kitchen, and outside during the day.

A.M. testified that the adults planned to play cards and celebrate the Defendant's birthday on the evening of March 21, 2018. She said that while she, the Defendant, and A.W. sat outside smoking cigarettes in her van, M.M. knocked on the van's window and stated that the victim wanted to talk to her. A.M. said she went inside and spoke to the victim, who was crying and stated the Defendant had touched her inappropriately. A.M. said she went to get A.W. A.M. said she went to the back door, where she could hear but not see the conversation between A.W. and the victim. A.M. said she could hear the victim screaming, "[Y]es, you did," and "You did do it." A.M. said she heard the Defendant call the victim "fast" and state that the victim was lying.

A.M. testified that she had not been present but had heard about an earlier conversation in which the victim had become upset when the Defendant told the children to leave the room where the adults were about "to do grown folks things." She said this conversation was reported to have taken place before she and the others had gone outside to smoke in her van.

A.M. testified that she told the Defendant, who had been living in her home in Lexington, that he would have to find another place to live.

The victim's mother testified that in March 2018, she worked about sixty hours per week and that she relied on others to help her with childcare. She said that the victim and R. visited with their grandmother, A.M., on March 20, 2018. The victim's mother said she picked up the victim and R. that evening.

The victim's mother testified about the conversation with the victim and the female adult family members. She said the conversation had been about school, making good grades, and not having unprotected sex. The victim's mother said the victim had run away with a boy on March 2 or 3, 2018. The victim's mother said the Defendant had come into the room during the conversation and that he mostly listened but had nodded in agreement and said, "[U]h-huh," at times. The victim's mother said she regretted having this conversation in the Defendant's presence and stated that he was not someone she had ever had babysit or discipline her children.

The victim's mother testified that on March 21, 2018, she took the victim to A.W.'s house for the day. The victim's mother said that when she was about to leave to go to work, the victim grabbed her arm, which was confusing because the victim usually wanted to spend time with her grandmother. The victim's mother said she learned that evening that the Defendant had sexually assaulted the victim. She said the victim had been upset that night and that she took the victim to a hospital to report the abuse the next day.

The victim's mother testified that the victim had oppositional defiant disorder, which caused the victim to disregard instructions and do the opposite. The victim's mother said she had not known the victim to be vindictive due to the diagnosis.

Memphis Police Detective Michael Yates collected the rape kit and sent it to the Tennessee Bureau of Investigation (TBI) laboratory for analysis. He said that in his initial investigation, he learned that the victim, R., and M.M. were alone with the Defendant but that he did not interview R. or M.M. at the time. He said he had been present about one and one-half weeks before the trial when M.M. was interviewed after the victim's grandmother, who was M.M.'s mother, provided new information.

M.M., a defense witness called out of order, testified that she was eleven at the time of the trial. She said that on the date that she, the victim, and R. were left alone with the Defendant while other adults went to Walmart, the three children played together. M.M. recalled that she had been with the victim the entire time and that the victim and the Defendant had not been alone together.

M.M. testified that the victim had told her about the Defendant's actions after the adults returned from Walmart but that M.M. had not told her mother that the victim and the Defendant had not been alone together until "way after that happened." M.M. said the Defendant was her favorite uncle and that she still talked to him.

The State recalled A.M., who testified that M.M. was present when the victim began revealing the Defendant's abuse. A.M. said M.M. had stated several times that she knew things about what happened between the Defendant and the victim. A.M. said she had not told this to the victim's mother or Detective Yates because she had not wanted M.M. to be involved. A.M. said she told the prosecutors about it the week before the trial.

A social worker from Our Kids testified that the victim was examined and interviewed on March 22, 2018. She recounted the victim's statement, in which the victim reported sexual abuse on a Tuesday and a Wednesday. The victim reported that on Tuesday, the acts had been penile/oral penetration, penile/genital penetration, digital/genital penetration, digital/breast contact, and oral breast contact. She reported that on Wednesday, the acts had been penile/oral penetration, penile/genital penetration, digital/genital penetration, digital/breast contact, and attempted oral/oral contact. The victim reported that the Defendant committed the acts on the first day while the victim's grandmother and aunt were out of the home. The victim reported consensual sex with another minor on March 2 and 3, 2018. The victim's mother had reported the victim's previous diagnoses of ADHD, depression, and oppositional defiant disorder.

A nurse practitioner from Our Kids and expert in forensic pediatric medical examinations testified that she collected evidence for the rape kit. She said the victim did

not have physical injuries. The nurse practitioner said this was not surprising, given the history the victim provided. The nurse practitioner said children typically did not have physical injuries or signs of sexual abuse. She said that the likelihood of positive findings is greater, the closer the examination is conducted to the assault.

TBI Special Agent Forensic Scientist Lisa Burgee, an expert in forensic serology and DNA testing, testified that a sample she examined of the inside front of the victim's bra contained alpha-amylase, which is found in human saliva. She said that upon further testing, she detected a DNA mixture of two individuals. She said that if one DNA profile was presumed to be that of the victim, the other profile was consistent with the Defendant's DNA profile. She said it was unlikely that the DNA was present due to secondary transfer and that it was more likely that the DNA on the bra was from the Defendant's saliva than from another source. She acknowledged that the possibility of DNA transfer from one person to another increased as two individuals spent time around each other.

Agent Burgee did additional testing. Presumptive testing for the presence of semen was negative for samples from the victim's underwear, sweatpants, shirt, and hoodie. Male DNA was identified through Y-STR testing on swabs of the victim's inner and outer labial areas collected during the rape kit examination. Agent Burgee was unable to develop a complete DNA profile due to the small amounts of DNA present. She did not conduct Y-STR testing for the presence of male DNA on the victim's clothing items.

A forensic interviewer testified that she interviewed the victim. The recording of the interview was played for the jury. The interview was consistent with the victim's testimony regarding her account of the assaults. The victim stated that the Defendant, not she, called her grandmother while the grandmother was on her trip to Walmart.

The Defendant testified that he went to Murfreesboro on March 19, 2018, with A.M. and M.M. to visit family and celebrate his birthday, which was March 22. He said that on the evening of March 20, he was alone with the children while the other adults went to Walmart for fifteen to twenty minutes. He said that he was never alone with the victim or either of the other children, all of whom were in the living room playing while he ate a sandwich and watched television in the kitchen. He thought he called A.M. to let her know the children were hungry. The Defendant said the victim had not wanted to be at A.W.'s house that day and that the victim had exchanged text messages with her boyfriend all day. He said that the victim and R. usually stayed home alone after school and that the victim wanted to be at home.

The Defendant testified that on March 21, 2018, the victim's mother brought the victim to stay at A.W.'s house while the victim's mother was at work. He said he was never alone with the victim that day. He later said, however, that he had been at the back door smoking when the victim approached him and pulled a half-smoked Maverick

cigarette from her bra and asked him for a light. He said that he told the victim she was too young to smoke and that she responded that her mother was aware she smoked. He said he told her to ask her mother for a light and to "get out of [his] face." He said the victim stomped off and yelled that she was tired of people telling her what to do and ruining her life. The Defendant stated that he smoked one-half of a cigarette at a time and that his half cigarettes had been "coming up missing" since the victim's arrival that day. He said that he smoked Maverick cigarettes and that A.M. smoked Newport cigarettes.

The Defendant testified that on the evening of March 21, 2018, he had been outside smoking in A.M.'s van with the other adults and that he went inside with A.W.'s husband to set up the card game. He said he told the children to get out of the living room and to go to the back room. He said the victim looked angry and did not go when the other children left. He said he told her he would give her a "whooping" if she did not go. He said the victim became enraged and cried. He said she stated that she hated him and his family. The Defendant said the victim raised the sexual abuse allegations five to ten minutes later.

The Defendant testified that after the allegations were made, he spoke to Detective Yates voluntarily. He said he had not mentioned anything about cigarettes and that Detective Yates had not asked him about cigarettes or mentioned DNA testing. He said that Detective Yates questioned him about the victim's being "flirty" and "fast" and that Detective Yates had been the one to mention this. He did not recall having said that the victim "knows the game" and probably would have liked for him to have done things to her, but he acknowledged that he probably said this to Detective Yates. He said he told Detective Yates about threatening to "whoop" the victim for not leaving the room and about the victim's "running around" with boys. He did not recall having told Detective Yates that he was never alone with any of the children. He said that if he had said this, he had believed at the time that A.W.'s husband had been home.

The Defendant acknowledged that he had seen the adult women having a conversation with the victim but said he had not overheard what was said.

The Defendant testified that he took medication which made him impotent and that he had not been sexually active in March 2018. He denied any sexual contact or activity with the victim. He said he first mentioned the cigarette incident to his attorney and thought he mentioned it after learning of the DNA results.

Dr. William Watson, an expert in DNA and serology, testified that the likelihood of DNA transfer increased the more two people were around one another. Regarding the DNA results obtained by the TBI laboratory, Dr. Watson said the amount of male DNA recovered on the inner and outer labial swabs was very small and might be accounted for by a shared bathroom or by transfer from a surface. He said there was no way to tell if the

DNA was present due to sexual activity. Regarding the male DNA from the victim's bra, he said the Defendant's having licked the victim's breasts was one possible mode by which the DNA might have been deposited. He said, however, that other modes of transfer might account for the presence of the male DNA. He said these possibilities might include transfer from the victim's taking a half-smoked cigarette belonging to the Defendant out of her bra.

Detective Yates testified as a rebuttal witness that the Defendant told him that the Defendant had never been alone with the children. He said the Defendant had blamed the victim and called her flirty. Detective Yates said the Defendant never mentioned the victim's having a cigarette and trying to smoke with him.

After receiving the evidence, the jury found the Defendant guilty of six counts of rape of a child and four counts of aggravated sexual battery. This appeal followed.

The Defendant's appellate issues all pertain to events which occurred during the State's final argument, in which the State addressed the credibility of defense witness M.M. In pertinent part, the State argued:

> And let's talk about [M.M.]. Does [M.M.] – is she believable? What do we have when we think about her testimony? She was eight years old at the time. If any of you have children that age, imagine asking them about something that happened two years ago, okay? That would be difficult, right?

> So, here we have an eight year-old girl who at the time of the event did not say anything, okay. She didn't say anything to anybody about being with her niece the whole time. And as soon as [the Defendant] is arrested and her favorite [uncle, the Defendant,] is put in jail, what does she do? She starts telling her mom, well, it couldn't have happened that way.

> She told you she still wants to still see [the Defendant]. She can't wait to talk to him. She's talked to him repeatedly before this trial came up. So, she has a motive. To say she has no reason to lie is not true.

The defense objected to the State's mention of the Defendant's having been in jail and referred to the trial court's ruling earlier in the trial that the State was not to "use the term jail" and should, instead, say "after [the Defendant] was arrested." The defense requested that the court not give a curative jury instruction on the basis that such an instruction would highlight the argument. The defense also moved for a mistrial. The court found that no manifest necessity existed for a mistrial but that the appropriate remedy would be for it to give a curative jury instruction. The court then instructed the jury to

disregard the reference to the Defendant's having been in jail. The court instructed the jury, as well, that the statements, arguments, and questions of the attorneys were not evidence and that the jury must decide the issues based upon the evidence received.

# I

## Mistrial

The Defendant contends that the trial court erred in denying his motion for a mistrial on the basis of the prosecutor's improper reference to the Defendant's having been in jail. The State counters that the court did not err in denying the motion. We agree with the State.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to the prejudice of a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the

-10-

comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

The Defendant argues that the majority of the *Judge* factors weigh in his favor on this issue. He notes the prosecutor's reference to "jail" despite the trial court's earlier instructions to the State not to use the term and contends that the State "appears" to have made the argument to show M.M. had a motive to lie. He also argues that "this was a close case" and that the improper argument likely affected the jury's assessment of M.M.'s credibility.

The State argues that the reference to the Defendant's having been in jail was a "brief slip made in the heat of argument," that the reference was isolated, that the argument was relevant to the State's theory that M.M. had been upset over the arrest of her favorite uncle and had fabricated a story that he had not been alone with the victim, that the reference to "jail" in this context was not prejudicial in light of the Defendant's having been charged with serious felony offenses, that the trial court gave a curative instruction, and that the State's evidence of the Defendant's guilt was strong.

The prosecutor's reference was brief and occurred only once, though in direct contravention of the trial court's previous ruling that the word "jail" was not to be used. As the State notes, the Defendant had been arrested for felony offenses, and the jury could reasonably infer that he had been in jail at some point. The reference was in response to defense counsel's closing argument regarding M.M.'s credibility as a defense witness. M.M. testified that the victim was never alone with the Defendant and that the Defendant was her favorite uncle. The fact that she had not reported this to her mother until after the Defendant was arrested was relevant to the question of her credibility regarding whether the victim and the Defendant were ever alone together. The court gave a curative instruction, and the jury is presumed to have followed the court's instructions. *See State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006) ("The jury is presumed to follow its instructions."). The State presented a strong case against the Defendant which consisted of the victim's testimony, forensic evidence, and corroborative evidence of key points of the victim's account of the circumstances surrounding the offenses. Information that the Defendant had been in jail at some point before the trial was insignificant in the overall context of the case and would not have affected the outcome of the trial.

We conclude that the trial court did not abuse its discretion in denying the motion for a mistrial. *Cf. State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994) (holding that the trial court properly denied the defendant's motion for a mistrial after a witness made an "unresponsive and unsolicited" statement about the defendant's having been in jail and a curative instruction was given). The Defendant is not entitled to relief on this basis.

## II

## Curative Instruction

The Defendant contends that the trial court erred in giving a curative instruction after the prosecutor mentioned during closing argument that the Defendant had been in jail. He argues that the court should not have given the instruction because defense counsel requested that the court not give the instruction in order to avoid emphasizing the mention of jail. The State responds that the court did not err in giving the instruction. We agree with the State.

After the prosecutor mentioned the Defendant's having been in jail, the trial court gave the following curative instruction:

> There was some reference about jail -- arrested and went to jail. The Court would instruct you that we have discussed that Mr. Hartshaw was arrested. There has been no testimony or evidence about Mr. Hartshaw being in jail.
>
> It has nothing to do with what's going on in this case, or there would have been evidence to that point. The Court would instruct you that you are to disregard the State's reference to Mr. Hartshaw being in jail. You are to strike that from your memory. You may not refer to it during your later deliberations.
>
> And as I previously told you, statements and arguments and questions of Counsel are not evidence. You must make your decision based solely on the evidence that you receive through the exhibits and from the witness stand. And you have had no testimony to that extent.

In the typical case, a trial court's obligation to give a limiting instruction is triggered "upon request." *See* Tenn. R. Evid. 105. However, in the absence of a request by counsel, a court has the inherent authority to give an appropriate instruction. *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 199 (Tenn. Ct. App. 2008) (citing Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 1.05(4), at 1-42); *see State v. Carruthers*, 35 S.W.3d 516, 554 n.40 (Tenn. 2000) (stating that if the defense fails to request a limiting instruction, the trial court should nevertheless consider *sua sponte* whether an instruction is required to prevent appellate reversal for plain error). Aside from any request by the parties, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975).

-12-

The Defendant preferred a mistrial to a curative instruction. The trial court denied the motion for a mistrial based on the absence of manifest necessity and found that the appropriate remedy was a curative instruction. The instruction given was not misleading as to the law or the evidence. The State's evidence was strong, and the brief mention of the Defendant's having been in jail after being arrested for felony charges would have had no prejudicial effect on the jury's verdicts. The court did not err in giving the curative instruction. The Defendant is not entitled to relief on this basis.

## III

## Cumulative Error

The Defendant contends that he is entitled to relief due to multiple errors which occurred during the trial. The State counters that no error occurred. We agree with the State.

The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

We have concluded that the trial court did not err in denying the motion for a mistrial and in giving a curative instruction. Thus, multiple errors do not exist, and reversal due to the existence of cumulative error is not required.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE